# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 29, 2023

Lyle W. Cayce
Clerk

_____

No. 22-50787

_____

United States of America,

*Plaintiff—Appellee*,

*versus*

Efren Derma-Dominguez,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 4:22-CR-54-1

_____

Before Stewart, Dennis, and Wilson, *Circuit Judges*.

Per Curiam:[*]

Efren Derma-Dominguez pleaded guilty to possession with intent to distribute marijuana and methamphetamine. The district court sentenced him to 108 months of imprisonment, followed by a five-year term of supervised release. He now appeals, arguing that the district court incorrectly calculated his sentence and erred in applying a sentencing enhancement. For

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

the following reasons, we AFFIRM in part and VACATE and REMAND in part.

## I. Factual & Procedural Background

In January 2022, a U.S. Border Patrol agent initiated a traffic stop near Redford, Texas, on a vehicle driven by Derma-Dominguez. The agent observed that Derma-Dominguez appeared nervous, and the rear area of the vehicle was heavier than usual despite there being no other visible occupants in the vehicle. In addition, earlier in the day, the agent had observed and stopped a similar-looking vehicle that he suspected to be a scout for law enforcement.

Upon searching the vehicle with Derma-Dominguez's consent, the agent observed "several square bundles wrapped in black trash bags with blue tape and burlap in the rear of the vehicle." Derma-Dominguez indicated that the bundles were marijuana. Upon further processing, it was later determined that the bundles contained approximately 450 pounds of marijuana. The agent also found in the vehicle two loaded AR-15 magazines and a bag containing 154 grams of methamphetamine. Derma-Dominguez was then placed under arrest.

During his post-arrest interview with Drug Enforcement Administration ("DEA") agents, Derma-Dominguez stated that he had been illegally living in the Midland, Texas area for several months when he began contacting people for human and drug trafficking work to make extra money. A man named "Saul," the operator of a smuggling organization, started giving Derma-Dominguez jobs. After Derma-Dominguez successfully completed at least six alien smuggling jobs, he was promoted to drug smuggling. He initially worked with an individual named "Bolitas," who worked for Saul. Then, after successfully completing several jobs, he was again promoted to working directly with Saul.

Derma-Dominguez explained to the agents that his usual drug smuggling procedure involved transporting the drugs to a stash trailer run by Bolitas in Odessa, Texas, and that the organization usually arranged smuggling trips every 15 days from Lajitas, Texas, to Odessa. Earlier that day, he had traveled to Lajitas to pick up the marijuana that the U.S. Border Patrol agent found in his vehicle. He also advised the agents about two trailers in Odessa and Midland, Texas, where he was "staying at" and had previously taken illegal aliens. He later gave agents written consent to search both trailers. He further advised that the 154 grams of methamphetamine that was found in the vehicle was for his personal use.

In March 2022, Derma-Dominguez pleaded guilty, without a plea agreement, to possession with intent to distribute 100 kilograms or more of marijuana and 50 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B). The probation officer prepared a presentence investigation report ("PSR") in April 2022. Based on the converted total drug weight of 3,282.5 kilograms (202.5 kilograms of marijuana and 154 grams of methamphetamine), the probation officer calculated a base offense level of 32. Derma-Dominguez received a two-level enhancement under U.S.S.G. § 3B1.1(c) for being "an organizer, leader, manager, or supervisor" in the criminal activity, and a three-level decrease for acceptance of responsibility. This resulted in a total offense level of 31. His offense level, combined with his Category I criminal history, yielded a guideline imprisonment range of 108 to 135 months.

Derma-Dominguez filed several objections to the PSR. He first challenged the § 3B1.1(c) enhancement, asserting there was no indication in the facts to suggest that he was anything other than a person transporting the drugs. The probation officer responded that the enhancement was correctly applied because Derma-Dominguez had management responsibility in the offense. This conclusion was drawn based on Derma-Dominguez's

agreement to smuggling ventures to gain the trust of the organization's members, his continuous communication with the organization for smuggling jobs, and his admission to housing illegal aliens and firearms in the two trailers where he also lived. Derma-Dominguez further argued that he qualified for a safety valve adjustment under U.S.S.G. § 2D1.1(b)(18) because he was not a leader or organizer in the offense. He also challenged the PSR's inclusion of the methamphetamine to determine his base offense level because he had indicated that the methamphetamine found in his vehicle was for his personal use. Finally, he challenged the converted drug weight's inclusion of the weight of the drug packaging.

At sentencing, a DEA task force officer testified to Derma-Dominguez's post-arrest statements that he did "such a good job" with smuggling aliens that the organization started giving him drug smuggling jobs, which were considered "higher value" jobs. The officer confirmed that Derma-Dominguez initially worked with a lower-ranking member of the organization but moved up to working directly with the organizer of the criminal enterprise. The officer also testified that the quantity of the methamphetamine found in the vehicle, which was in one large bag, indicated that the methamphetamine was for distribution.

The district court overruled Derma-Dominguez's objections to the § 3B1.1(c) enhancement, as well as the inclusion of the quantity of the methamphetamine in calculating his base offense level. In response to Derma-Dominguez's challenge to the calculation of the converted total drug weight, *i.e.*, that it erroneously included the weight of the drug packaging, the district court reduced the drug weight "across the board" by the "standard" 10 percent. The probation officer indicated that the reduction did not change Derma-Dominguez's total offense level.

The district court adopted the PSR's findings and application of the Guidelines and sentenced Derma-Dominguez to 108 months of imprisonment, followed by a five-year term of supervised release. Derma-Dominguez filed this appeal.

## II. Discussion

### A. Application of the 3B1.1(c) Enhancement

On appeal, Derma-Dominguez argues that the district court erred in applying the § 3B1.1(c) enhancement because he was not an organizer, leader, manager, or supervisor of the criminal activity. He also contends that but for the district court's application of the enhancement, he would have been eligible for a safety valve adjustment under U.S.S.G. § 2D1.1(b)(18), which would have resulted in a two-level decrease. The Government counters that the district court correctly applied the enhancement because Derma-Dominguez controlled the organization's large drug load at a key point in the distribution chain and at the trailers in Odessa and Midland, and he also had a consistently escalating status and involvement within the organization. As we explain below, we agree with the Government for these and other reasons.

Derma-Dominguez objected to the § 3B1.1(c) enhancement in the proceedings before the district court, so he has preserved the issue for appeal. *See United States v. Fillmore*, 889 F.3d 249, 252 (5th Cir. 2018). We review the district court's findings concerning a defendant's role in the offense for clear error. *Id.* at 255. The district court's factual findings must be supported by a preponderance of the evidence. *Id.* "A factual finding that is plausible based on the record as a whole is not clearly erroneous." *United States v. Ochoa-Gomez*, 777 F.3d 278, 282 (5th Cir. 2015).

Section 3B1.1(c) of the Guidelines provides for a two-level enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1(c). "The application

notes to section 3B1.1 require that the defendant either (1) exercised control over another participant in the offense, or (2) 'exercised management responsibility over the property, assets, or activities of a criminal organization.'" *United States v. Delgado*, 672 F.3d 320, 345 (5th Cir. 2012) (en banc) (quoting § 3B1.1, comment. (n.2)); *see also Ochoa-Gomez*, 777 F.3d at 282–83. The commentary to § 3B1.1 provides a list of factors to consider when determining a defendant's role in the offense, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *See* U.S.S.G. § 3B1.1, comment. (n.4).

In *Delgado*, this court sitting en banc recognized that Application Note 2 provides an alternative basis for imposing the § 3B1.1(c) enhancement, *i.e.*, exercising management over the property, assets, or activities of a criminal organization, as opposed to exercising control over other participants in the offense.[1] 672 F.3d at 345. In that case, law enforcement agents found marijuana in the cab of the defendant's tractor-trailer, and an investigation showed that the defendant, who owned a trucking company, arranged for the transportation and delivery of the marijuana through her company, which involved falsifying bills of lading. *Id.* at 326–27, 345. The en banc court affirmed the application of the enhancement after concluding that the district

---

[1] Application Note 2 provides that "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." U.S.S.G. § 3B1.1, comment. (n.2).

court did not clearly err in its determination that the defendant had exercised management responsibility over the property and activities of the drug trafficking ring. *Id.* at 345.

This court has followed and applied *Delgado*'s interpretation of Application Note 2 in subsequent cases. *See Ochoa-Gomez*, 777 F.3d at 282–83 ("Our court, sitting *en banc*, has construed Note 2 to allow application of an *adjustment*, even where a defendant did not exercise control over another participant, if he exercised management responsibility over the property, assets, or activities of a criminal organization." (emphasis in original)). In *Ochoa-Gomez*, the defendant facilitated and coordinated the transportation of drugs, negotiated the price of transporting the drugs, stored and packaged the drugs, and delivered the drugs to an undercover officer. *Id.* at 283. Citing *Delgado* and *United States v. St. Junius*,[2] a panel of this court affirmed the enhancement on the basis that the defendant played an integral role and exercised management responsibility over the property, assets, or activities of the criminal organization. *Id.* at 284.

Additionally, other panels of this court have upheld the application of the enhancement when faced with similar factual scenarios. In *St. Junius*, 739 F.3d at 208, this court again observed that the 3B1.1 enhancement "may be appropriate where 'a defendant did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.'" (quoting *Delgado*, 672 F.3d at 345). There, the panel upheld the enhancement on the grounds that the defendant, although not the actual leader, played a significant role in the functioning of the enterprise and profited more from it than any other participant other than the leader. *Id.* In

_____

[2] 739 F.3d 193 (5th Cir. 2013).

affirming the enhancement the court noted that it was plausible in light of the record that the defendant "exercised some level of management responsibility over the property, assets, or activities" of the company through which the criminal enterprise was conducted. *Id*. at 209.

Our unpublished cases have also followed suit. In *United States v. Johnson*, No. 22-30119, 2023 WL 2388358, at *2 (5th Cir. Mar. 7, 2023) (unpublished), this court affirmed the enhancement where evidence had been introduced showing that the defendant "supplied the street-level distributors with methamphetamine that he obtained from [his co-defendant]" and that his "position in the distribution chain gave him control over the other conspirators' access to the drug." *Id*. The panel concluded on those facts that the defendant exercised management responsibility over the property, assets, or activities of the criminal enterprise. *Id*.

Similarly, in *United States v. Abreu*, No. 21-60861, 2023 WL 234766, at *3 (5th Cir. Jan. 18, 2023) (unpublished), a panel of this court affirmed the enhancement where the defendant's "role as an organizer included arranging for transportation, counting cash, and providing items to process the cocaine." In so doing, the panel noted that on those facts, "the district court's finding that [the defendant] was an 'organizer' [was] 'plausible in light of the record as a whole.'" *Id*. (quoting *United States v. Rodriguez*, 630 F.3d 377, 380 (5th Cir. 2011)).

Finally, in *United States v. Johnson*, No. 21-10454, 2022 WL 1773365, at *2–3 (5th Cir. June 1, 2022) (unpublished), a panel of this court affirmed the enhancement where the defendant purchased drugs from a larger dealer and then sold the drugs to other individuals. The panel reasoned that in purchasing and selling the drugs, the defendant "exercised control over the organization's drug supply to some extent." *Id*. at *2; *see also United States v. Hernandez*, 451 F. App'x 402, 404 (5th Cir. 2011) (unpublished) (affirming

application of the § 3B1.1 enhancement under the clear error standard of review and explaining that "even if [the defendant's] primary role was not as a supervisor of other participants, the record indicate[d] that he exercised managerial responsibility over the drugs and drug proceeds").

Here, although Derma-Dominguez argues that this court in *Delgado* misread Application Note 2 and that the application of the § 3B1.1 enhancement "cannot be based solely on management of property, assets, or activities," this court nevertheless remains bound by *Delgado* under the rule of orderliness. *See United States v. Warren*, 986 F.3d 557, 569 (5th Cir. 2021) (indicating disagreement with cases applying § 3B1.1 "based solely on management of property, assets or activities," but acknowledging that the court was bound by those decisions under the rule of orderliness). Accordingly, under this circuit's current controlling caselaw, a § 3B1.1 enhancement may be based on *either* the defendant's control over other people in the organization *or* his management of the organization's property, assets, or activities. *See Delgado*, 672 F.3d at 345; *Ochoa-Gomez*, 777 F.3d at 282–83.

Given our controlling precedent in this area, we conclude that the district court did not clearly err in applying the enhancement on this record. Contrary to his arguments on appeal, Derma-Dominguez's actions in this case are hardly distinguishable from those of the defendants in *Delgado*, *Ochoa-Gomez*, *St. Junius*, and this court's unpublished opinions in *Johnson* (2023), *Abreu*, *Johnson* (2022), and *Hernandez*, all of whom were determined to have "exercised management responsibility over the property, assets, or activities of a criminal organization" under U.S.S.G. § 3B1.1, thus warranting application of the enhancement. In those cases, the defendants often worked closely with the leader or head of the criminal enterprise, engaged in high-level and profitable transactions, and participated in multiple ways to assist in achieving the goals of the organization. Although Derma-Dominguez

initially started off working less profitable jobs with lower-ranking members of the organization, he was quickly able to show that he was reliable and trustworthy by successfully completing several alien smuggling jobs. Thereafter, he swiftly advanced to higher-level and more profitable drug smuggling jobs and was soon promoted to working directly with the lead operator of the organization—Saul. During the span of several months, he transported numerous loads of drugs from Lajitas to Odessa. On the day of his arrest, he had traveled to Lajitas to retrieve a large load of marijuana that was intended to be dispersed to other individuals to distribute. When he was arrested, he had 202.5 kilograms (or approximately 450 pounds) of marijuana, 154 grams of methamphetamine, and two loaded AR-15 magazines. He further stated that he "stayed," or resided in, the stash trailers. His statement that he lived in the stash trailers was further corroborated when he gave agents permission to search the trailers in Odessa and Midland. He also admitted that the photos of the firearms and ammunition that agents had located on his cell phone were taken at the trailers where he lived.

In sum, we conclude that Derma-Dominguez was more than a low-level drug courier. His actions in this case squarely conformed to the enhancement's parameters as defined by the guidelines and this court's reasoning in *Delgado*. 672 F.3d at 345 (explaining that a § 3B1.1 enhancement may be based on *either* control over people *or* management of assets). Likewise, this court's precedent (both published and unpublished) supports application of the enhancement. *See Ochoa-Gomez*, 777 F.3d at 283–84; *St. Junius*, 739 F.3d at 208; *Johnson*, 2023 WL 2388358, at *2; *Abreu*, 2023 WL 234766, at *3; *Johnson*, 2022 WL 1773365, at *2–3; *Hernandez* 451 F. App'x at 404. Consequently, we hold that the district court did not clearly err in applying the enhancement on this record. *Fillmore*, 889 F.3d at 255.

*B. Drug Weight Reduction*

Derma-Dominguez further argues that this court should vacate his sentence and remand to the district court for resentencing because the district court did not correctly recalculate his guidelines range of imprisonment after granting a 10 percent reduction in the converted drug weight due to the erroneous inclusion of the drug packaging. The Government agrees that this court should remand for resentencing on this basis. We also agree.

The district court's drug quantity calculation is a factual determination that this court ordinarily reviews for clear error. *United States v. Lujan*, 25 F.4th 324, 327–28 (5th Cir. 2022). However, because Derma-Dominguez did not raise the issue concerning the recalculation in the district court, our review is for plain error. *See United States v. Kearby*, 943 F.3d 969, 975 (5th Cir. 2019). To establish plain error, Derma-Dominguez must demonstrate (1) an error (2) that is clear or obvious, rather than subject to reasonable dispute, and (3) that affected his substantial rights. *See Puckett v. United States*, 556 U.S. 129, 135 (2009). If he does so, we may correct the error only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotation marks, citation, and brackets omitted).

Recall that at sentencing the district court reduced the total converted drug weight by 10 percent to account for the erroneous inclusion of the weight of the drug packaging. The probation officer initially determined that the converted drug weight attributable to Derma-Dominguez was 3,282.5 kilograms, which gave Derma-Dominguez a base offense level of 32. This ultimately yielded a total offense level of 31 and a guidelines range of imprisonment of 108 to 135 months. But the district court's reduction of the total converted drug weight by 10 percent reduced the converted drug weight by 328.25 kilograms to 2,954.25 kilograms. With this reduction, Derma-Dominguez's new base offense level should have been 30, two levels less than

his original base offense level. *See* U.S.S.G. § 2D1.1(c)(5). The district court, however, determined that his base offense level would not change following the 10 percent reduction. That conclusion was in error.

With a base offense level of 30, the two-level § 3B1.1(c) enhancement, and the three-level decrease for acceptance of responsibility, Derma-Dominguez's new total offense level would be 29, which would give him a guidelines range of imprisonment of 87 to 108 months. *See* U.S.S.G. Ch. 5, Pt. A. Derma-Dominguez was sentenced to 108 months of imprisonment, which reflects the lower end of the guidelines range for a total offense level of 31 and would be the higher end of the guidelines range for his new total offense level of 29. Accordingly, we exercise our discretion and vacate Derma-Dominguez's sentence in part, on this sole issue, and remand for recalculation of his sentence to account for the new base offense level resulting from the 10 percent decrease of the total converted drug weight. *See United States v. Randall*, 924 F.3d 790, 801 (5th Cir. 2019) (remanding when "the appropriate remedy is re-sentencing, which can be accomplish[ed] fairly quickly and without extraordinary expense"); *see also United States v. Blanco*, 27 F.4th 375, 381 (5th Cir. 2022) (reasoning that a "district court's reliance on an incorrect Guidelines range will usually suffice to show an effect on the defendant's substantial rights where the record is silent as to what the district court might have done had it considered the correct Guidelines range" (internal quotation marks and citation omitted)); *Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016) ("When a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error.").

### III. Conclusion

No. 22-50787

For the aforementioned reasons, Derma-Dominguez's sentence is AFFIRMED in part and VACATED and REMANDED in part.

No. 22-50787

JAMES L. DENNIS, *Circuit Judge*, concurring in part, dissenting in part:

I concur fully in Part II.B of the majority opinion, which remands for resentencing because the district court did not correctly recalculate Derma-Dominguez's offense level and guidelines range of imprisonment after granting a 10 percent packaging reduction in relation to the converted drug weight. However, I respectfully dissent from the majority's conclusion in Part II.A that Derma-Dominguez warrants the enhancement under U.S.S.G. § 3B1.1(c) for being "an organizer, leader, manager, or supervisor" in the drug smuggling operation. Because the record contains no evidence that Derma-Dominguez had management responsibility over the property, assets, or activities of a criminal organization, the district court clearly erred in applying the enhancement.

Section 3B1.1(c) provides for a two-level enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity." Because Derma-Dominguez objected to the enhancement in the district court, we review the district court's finding as to his role in the offense for clear error. *United States v. Fillmore*, 889 F.3d 249, 255 (5th Cir. 2018). As the majority notes, under our precedent and based on application note 2 to § 3B1.1, a defendant's conduct may warrant application of § 3B1.1(c) not only if he exercised control over another participant in the offense, but also if he "exercised management responsibility over the property, assets, or activities of a criminal organization." *United States v. Delgado*, 672 F.3d 320, 345 (5th Cir. 2012) (en banc) (quoting § 3B1.1 cmt. n.2); *see also United States v. Ochoa-Gomez*, 777 F.3d 278, 282 (5th Cir. 2015).[1]

---

[1] While Derma-Dominguez persuasively argues that this court in *Delgado* misread application note 2 in holding that application of the § 3B1.1 enhancement can be based solely on management of property, assets, or activities, I agree with the majority that, under our rule of orderliness, we remain bound by *Delgado*'s holding that *either* the defendant's control over other people in the organization *or* his management of the organization's

No. 22-50787

Factors to consider when determining a defendant's role in the offense include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

§ 3B1.1 cmt. n.4.

The plain text of application note 2 requires "*management responsibility*" over the property, assets, or activities of a criminal organization. § 3B1.1 cmt. n.2 (emphasis added). Accordingly, in each of our cases affirming application of the enhancement, the defendants went beyond mere physical control of contraband; instead, they were involved in some way in planning or decision-making regarding control of the contraband—*e.g.*, arranging for transportation or delivery of contraband, owning or presenting as the owner of the organization, or distributing contraband to lower-level members. *See, e.g.*, *Delgado*, 672 F.3d at 345 (affirming when the defendant, who owned a trucking company, arranged for the transportation and delivery of the marijuana through her company, which involved falsifying bills of lading); *Ochoa-Gomez*, 777 F.3d at 283-84, (affirming when the defendant coordinated the transportation of drugs, negotiated the price of transporting the drugs, stored and packaged the drugs, and delivered drugs to an undercover officer); *United States v. Junius*, 739 F.3d 193, 208 (5th Cir. 2013) (affirming when the defendant, who profited the most from the scheme, led

---

property, assets, or activities warrants application of § 3B1.1(c). *See United States v. Warren*, 986 F.3d 557, 569 (5th Cir. 2021).

others to believe she was the owner of the business involved in a Medicare fraud scheme, signed Medicare documents, signed and issued paychecks, and sent correspondence as the owner of the business); *United States v. Johnson*, No. 22-30119, 2023 WL 2388358, at *2 (5th Cir. Mar. 7, 2023) (unpublished) (affirming when defendant supplied the street-level distributors with methamphetamine that he obtained from his co-defendant and in that way controlled the other conspirators' access to the drug); *United States v. Johnson*, No. 21-10454, 2022 WL 1773365, at *3 (5th Cir. June 1, 2022) (unpublished) (affirming when the defendant purchased drugs from a larger dealer and then sold those drugs to individuals, showing he exercised control over the organization's drug supply to some extent); *United States v. Abreu*, No. 21-60861, 2023 WL 234766, at *3 (5th Cir. Jan. 18, 2023) (unpublished) (affirming when the defendant's arranged for transportation, counted cash, and provided items to process the cocaine); *United States v. Hernandez*, 451 F. App'x 402, 404 (5th Cir. 2011) (unpublished) (affirming when the defendant exercised managerial responsibility over the drugs and drug proceeds).

Here, the evidence shows only that Derma-Dominguez transported marijuana at the order of others and had no decision-making control over the drugs. Derma-Dominguez took orders from Bolitas and then later Saul after successfully completing a few jobs. Every fifteen days Derma-Dominguez would pick up cargo in Lajitas, Texas, and transport it to Bolitas's stash RV in Odessa, Texas. On the day of his arrest, Derma-Dominguez followed this usual scenario. He travelled from Odessa to Lajitas and picked up the marijuana. He then drove to Presidio, Texas, to wait for orders from Saul. After Saul told him the border checkpoint was closed and gave him the okay, Derma-Dominguez attempted to proceed to Odessa but was apprehended.

Looking to the factors in the § 3B.1.1 commentary, the evidence does not show any "decision making authority," participation in "planning or

organizing the offense," or "control and authority exercised over others." § 3B1.1 cmt. n.4. Further, Derma-Dominguez did not participate in "recruitment of accomplices" or "claim[] right to a larger share of the fruits of the crime." *Id.* When considering "the nature of participation in the commission of the offense" and "the nature and scope of the illegal activity," while Saul trusted Derma-Dominguez to successfully transport the marijuana, the most the evidence shows is that Derma-Dominguez was a good drug runner, moving marijuana as ordered by higher-ups. *Id.* While Derma-Dominguez had some responsibility to move these assets (as every drug runner does), it was not *management* responsibility. *See* § 3B1.1 cmt. n.2.

Although the majority states that Derma-Dominguez "traveled to Lajitas to retrieve a large load of marijuana that was intended to be dispersed to other individuals to distribute," there is no evidence that he was involved in any aspect of the operation, including distribution, beyond transporting the drugs from Lajitas to Odessa. The majority also states that Derma-Dominguez "stayed, or resided in, the stash trailers" in Odessa, showing some management authority, but that fact is neither stated in the evidence nor was it found by the district court. As the Presentence Investigation Report (PSR) puts it, there was a "stash RV trailer in Odessa, Texas which [wa]s run by an individual named 'Bolitas,'" and a paragraph later on the next page, "Derma-Dominguez described to agents two trailers in Odessa and Midland, Texas where he was staying." It was these latter two trailers which the PSR says Derma-Dominguez "gave agents written consent to search." While the stash trailer and one of Derma-Dominguez's living trailers were both in Odessa, the PSR does not state they were the same, and in fact, the PSR states Bolitas (not Derma-Dominguez) ran the stash trailer. The officer who testified at the sentencing did not elaborate on the trailers or state that any contraband was found during the search of Derma-Dominguez's trailer. There may be two different trailers in Odessa, and the

district court did not make a finding that the two trailers were the same. As a court of review, we cannot find such facts in the first instance. *Cf. Bay Sound Tranps. Co. v. United States*, 410 F.2d 505, 512 (5th Cir. 1969) ("[T]he District Court [must] determine the essential facts upon which it bases its judgment; where the trial Court fails to do so, this Court cannot make such findings of fact.").

"A factual finding is clearly erroneous if it is unsupported by the record or creates the firm conviction that a mistake has been made." *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 498 n.4 (5th Cir. 1987) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, (1948)). The record shows Derma-Dominguez only transported marijuana at the order of others and exercised no managerial control over the drugs. Not once does the evidence state he made an independent decision or exercised control over the operation's plan. The Guidelines permit an enhancement only for "*management* responsibility" over the property, assets, or activities of a criminal organization, but the majority affirms on the handling of drugs alone. § 3B1.1 cmt. n.2 (emphasis added). Not every drug runner is a manager—to think as much would be absurd—but the majority's reasoning dangerously opens the door to such an outcome. Because the record lacks any evidence that Derma-Dominguez had management responsibility over the drugs in this case, the district court's finding to the contrary is clearly erroneous. *See Citizens for a Better Gretna*, 834 F.2d at 498 n.4.

I respectfully dissent.